### JULIUS KAYSER & CO. et al. v. ROSEDALE KNITTING CO.

### No. 8519.

District Court, E. D. Pennsylvania.
April 13, 1937.

Noah A. Stancliffe, of New York City, Joseph G. Denny, Jr., and Charles H. Howson, both of Philadelphia, Pa., and Hugh M. Morris, of Wilmington, Del., for plaintiffs.

Samuel E. Darby, Jr., and A. I. Spiro, both of New York City, Henry N. Paul, of Philadelphia, Pa., and Thomas G. Haight, of Jersey City, N. J., for defendant.

DICKINSON, District Judge.

This cause concerns United States letters patent No. 1,969,307, issued to Charles A. Kaufman August 7, 1934, on an application filed May 20, 1932.

The patent is a method and product patent. All its claims are in issue. It was granted for a claimed invention or discovery of a "new and useful art" and for a "manufacture." The particular method invention claimed is that of knitting a stocking fabric so as to practically eliminate the appearance of what are called rings in the leg of the stocking. The method is known to this record as the three carrier method. It applies to full-fashioned hose chiffon stockings, knit of natural animal silk threads. The idea of the invention begins with the fact that such threads are the product of the silk worm. They are not uniform in the diameter size of the thread. When the stocking was knitted by the pre-invention method, these irregularities in the size of the threads gave the ocular appearance of rings in the stocking except very closely or very openly knit ones. The sole purpose of the invention was to get rid of the appearance of rings by producing "Ringless Stockings."

The real defense is that this patentee invented nothing except perhaps the advertising slogan of "Ringless Stockings." He did not even invent this because he makes no claim to have originated the phrase. There is no difference between a stocking produced by the old method and one produced by the new, otherwise than in its appearance. Well-tooted changes rung on the slogan "Ringless Stockings" might, however, make of them the only stockings sold. The producers of "Ringless Stockings" would thus have a monopoly of this branch of the hosiery trade. The right to produce them would be indispensable to every hosiery mill. Two very abundant sources of profit were thus opened to any one who could secure a patent upon the production of "Ringless Stockings." One was the profit from their manufacture. The other was the receipt of license fees from the numerous hosiery mills of the country. The idea upon which the claim to a patent rested was the common property of many and was well known to the trade. Several mills employed this method and were fathering rival claims to the invention. In fact, after this application had been filed six or seven interferences were declared and another afterwards admitted. What the plaintiff is charged to have done is to have formed a conspiracy to monopolize the full-fashioned or chiffon hosiery trade through and by the procuring of the patent in suit. Into this conspiracy were brought all who were interested in the pending applications by allotting to them shares in the prospective profits. The plan was for all those who figured in the interference proceedings in the Patent Office to concede priority of in-

vention to one of them and thus enable the plaintiff to secure the issue of a patent. With this leverage, as many of the mills as could be thus reached, were to be intimidated by threats of patent litigation, so as to be induced to take out licenses from the conspirators and all others were by like threats to be deterred from encroaching upon the monopoly. It was in this way that the patent in suit is charged to have been obtained. This introduces a digression necessary to an understanding of the issues presented.

The bill is the usual patent infringement bill. The formal defenses are noninfringement and invalidity. In addition to the defenses mentioned, the defendant has pleaded a counterclaim for damages suffered by reason of the unfair competition with which the plaintiff is charged, and we are further asked to dismiss the bill because the hands by which it is presented are unclean.

The real controversy is over the issue of the validity of the patent. Preparatory to its discussion, we will dispose of these other defenses. The defense of noninfringement is a mere formality. Infringement is admitted as to the method claims and its denial is not interposed to the product claims. Indeed, the real purpose of the defendant would be defeated by a finding of noninfringement. What it is really seeking is a finding of invalidity. The noninfringement branch of the defense is disposed of by its not being pressed and infringement is found if the Patent is valid.

Many interesting questions could be raised over the counterclaim defense. Into these we will not go, for the reason that this branch of the defense has not been argued and because of this we will not discuss it. If the defendant desires to press it we will give it the opportunity.

We formally dispose of the counterclaim by dismissing it.

■ The defense of "unclean hands" rests upon the fact averment that the plaintiffs' hands have been soiled by the tactics employed. It is beyond controversy that it is a doctrine of equity, and indeed an adage that every applicant for equitable relief shall show himself to be free from guile. This rests upon the doctrine that every application for relief through the forms of equity is the invocation of a privilege, not the assertion of a right.

The relief which a chancellor grants is always of grace. It can never be demanded as a right. The beautiful symmetry of the procedural systems, both of law and equity, has however been marred by arbitrary innovations. Resort to a bill in equity in patent cases does not depend wholly upon equitable principles. It is now a statutory right. That right is conditioned upon several things, but that the plaintiffs should be persona grata to the chancellor is not one of them. The plaintiffs' right to maintain a bill rests in patent cases, not upon equitable principles, but upon the statute. The defenses are likewise statutory by the defendant being permitted under the general issue to offer evidence of the special matters set forth in the statute.

■ The charge really rests upon the averment, the truth of which is frankly admitted, that the seven or eight rival claimants to this invention who were parties to the interference proceeding in the Patent Office, agreed among themselves to submit their respective claims of priority of invention to an arbitrator by whose decision they agreed to abide. The arbitrator decided in favor of the patentee. The others accordingly conceded priority to him and the Commissioner issued to him the patent in suit.

There is this to be said of this agreement: Patent litigants, as all others, are encouraged by the law to settle their differences. There is nothing unlawful or improper in their so doing. A patentee must, however, have been not merely the inventor of the subject-matter of the patent but also the first inventor. Among rival claimants in an interference proceeding the Patent Office must decide. Concessions and admissions made by litigants, so far as the parties are concerned, are evidentiary between the parties to the interference. If the other interferers concede priority to one, a patent may issue to him. Neither the ruling of the Commissioner nor the admission of the parties affects others. Upon an issue of validity all the patentee gets is the prima facie evidence of his patent. If the ruling of the Commissioner was based wholly upon the admission of the parties to the interference, the patentee would get only this technical benefit.

This comment may, however, be added. Under an agreement, such as was here made, all the several claimants would have an interest in the claimant, to whom pri-

ority was conceded, being in truth and fact the first inventor, because if he were not the patent would have no validity.

We dispose of the "unclean hands" defense by the ruling that if the patent in suit is valid, the bill may be sustained.

This takes us to the real defense of invalidity. This resolves itself into the simple question of fact of whether this patentee was "the original and first inventor or discoverer" of the process of knitting full-fashioned chiffon stockings by the three carrier method. This, of course, means first inventor within the meaning of the patent laws. Usually contests of this kind are between rival claimants to an invention. The patent should issue to one or the other. It should never be forgotten, however, that a patent is a monopoly. The public is in consequence always concerned. A monopoly is a thing of commercial value. It is so because the possessor is thereby able to reap a harvest, the yield of which he could not otherwise command. What he gets is at the cost of the ultimate consumer. To the public, monopoly has always been anathema. In the days of Queen Elizabeth the evil was widely felt. Monopolies were rampant. They were granted wholly by the grace of the sovereign. With us the grant is regulated by law. Congress was given the power to grant monopolies but only for the purpose expressed in the Constitution as that "to promote the progress of science and of the useful arts." There is thus a quid pro quo. The patentee is given a monopoly "for a limited time" in consideration of the contribution he has made to the public weal. Unless he has paid this price he gets nothing by his grant. This presents the real controversy here.

It is claimed on behalf of the patentee that he has given value for his patent. The defendant denies this. Thus we have the real issue. It is not, we repeat, whether the patent should have issued to one or another of the numerous claimants, but whether it should issue to any one. This remains true notwithstanding the formal issue is whether the patent of this patentee is valid. Of course if he was not the first inventor he takes nothing by his patent but the real controversy is between the claimant to a monopoly and the trade affected by it. It is a matter of indifference to the defendant whether the patent issued to one applicant or another. Their hope is that it issued to the wrong person. The plaintiffs in practical effect claim a monopoly or the exclusive right "to make, vend or use" "Ringless Stockings." Incidentally, if accorded that right, it will go far toward a monopoly of the whole trade in women's hosiery, and through this of the whole trade. If, however, the plaintiffs have a legal right to the monopoly asserted, they must prevail so far as it is a monopoly granted by a valid patent.

### The Case for the Patentee.

From the earliest times natural animal silk threads, the product of the silkworm, have been used in the production of woven and knitted fabrics. The optical effect of bars or streaks and in stockings, rings, was present in much of the product. This did not detract from the real utility of the fabric, but it did mar its appearance in the eyes of the fastidious. When too pronounced the product was classified as seconds or rejections. The trade attributed the appearance of these bars or rings to the unevenness in diametric measurement, throughout their length, of the threads of which the fabric was woven or knitted.

We may interpolate here that one of the expert witnesses for the plaintiffs at the trial ascribed to a different cause the ring appearance. The ring, as we understood him, is an optical effect or illusion. The effect is produced by differences in the light which is admitted through the orifices in the texture of the fabric. It is in consequence not present either in closely knit or open fabrics. The product over which we have this controversy is called chiffon stockings. The word "chiffon" carries the thought of adornment. The chiffon stocking is translucent. When on the leg of the wearer the optical effect is a composite. It is due in part to the stocking and in part to the leg inclosed in it. We are not sure that we grasp the bearing on the present controversy of this difference in the theory of the cause of the ring appearance. The trade, however, attributed the rings to differences in the thickness of the silk thread. This would seem to mean the same thing as transmitted light. Having this idea, the effort was made to obviate this by a more even thread. The silkworm, however, proved obdurate, refusing to alter his product at the behest of weavers and knitters. Attempts at selection did not solve the problem. As the thicker part of the thread would absorb more dye than the thinner, improved dyeing methods were tried. The patentee

claims to have contributed the thought of minimizing the danger of the fabric showing streaks by instead of using one thread from one spool to use threads from different spools in rotation. This is the three carrier method. The chances were that the thickened part of a thread from one spool would thus be alongside of the thinner part of another thread from a different spool. This did not promise to eliminate or prevent rings, but it did promise to reduce the chances of their appearance. This method, plaintiffs assert, was the product of invention justifying a patent.

It should be added, however, that the very same method was followed in the manufacture of woven fabrics and in the knitting of articles of wearing apparel, such as sweaters, neckties, and the like. The method suggested was brought to the attention of the hosiery trade, but manufacturers did not think it worth while to change their methods from the single to the three carrier method. One reason doubtless was that the knitting of stockings was an already complicated process and they did not care to make it more complicated. As the inequalities in the silkworm thread had always been present, bands and rings must have appeared from the beginning. For a long time, however, the demand of buyers for stockings free from this defect was not very strong or insistent although there were complaints. The trade comfortably assumed that users would accept the product they could get. This expectation was justified. The demand, if any, for ringless stockings was not urgent. None of the numerous persons who might have laid claim to the invention of what is known to this record as the three carrier method, thought it worth while to apply for a patent. This was because in horse and buggy days of long skirts, rings in stockings were not a serious defect, for the reason that the observer saw nothing of the stocking except when he was afforded an occasional glimpse of a well-turned ankle. This was so fleeting that he did not see the stocking. When, however, short skirts became the vogue, the gaze of the beholder was not limited to well-turned ankles, but might delightedly rest upon shapely nether limbs and even more. It could not be endured that the spectator should, by the obtrusion of defects in the stocking, have his attention distracted from the contemplation of the beauties of form displayed. Hence

the utility of this invention. "Utility" is hardly the right word. What was wrought by the invention was not increased usefulness but embellishment. Several things co-operated to make the demand for ringless stockings imperative, but short skirts alone would have sufficed. A law more inexorable than that of Moses or of Draco had so decreed. Women thereafter would not buy stockings marred by rings. This record does not disclose just when short skirts came into fashion. It took a little time for the trade to appreciate the change. When it did, the demand for some means of producing ringless stockings became feverish. This explains the common rush for the Patent Office. The interference proceedings brought a pressure to bear upon each applicant for a patent, to push the date of his invention as far back as he conscientiously could, in order to induce the finding that he was first. The circumstance that these many inventors conceived of the same indentical invention and fix nearly the same time when it came to their minds, has a significance which will later be given comment.

## Invention.

█ This introduces the question of what invention is. It has often been remarked that no acceptable definition of "invention" has as yet been formulated and the very confident prediction has been made that it never will be. What concerns us, however, is not what is invention but what gives the right to a monopoly under the patent laws. This has been clearly defined by the statute and the rulings construing it. Care must be taken to distinguish between patentable invention and the proofs by which it is established. There must be in it the element of novelty. The patentee must not only have originated the idea, but he must have been the first to have done so. Here we encounter a law of our intellectual being. The' human mind is incapable of taking in any new idea in the lump or rough. Full-fledged creations are the creatures of Grecian myths. Intellectually we are coral builders. We get our comprehension of a new idea by gradual accretions. Every idea is a growth. We follow the order of creation. The nebulous vapor appears before it takes on substance and form. The earth was without form and void and then the dry land appeared. Hence the truth of the adage "there is nothing new under the sun." The patent

l

law has regard to this in determining priority of invention between two rival claimants.

To enable us to determine the respective dates of invention, the inventive thought is viewed as having stages of development. First we have the origination of the idea or the conception. The only evidence obtainable of this is the testimony of the inventor. Obviously something more than this must be required. Then we have the disclosure to others. This is capable of more definite proof and may establish the fact of the existence of the inventive idea. Next we have reduction to practice, actual or constructive. This date is likewise capable of more or less definite proof. Finally we have the patent application. The date of this is definite.

Out of the fact situation presented the trier of fact is usually able to make a finding of priority in date. To assist him the law supplies artificial aids, such as the prima facie evidence of the grant of a patent and the like. Were our problem that of finding which of the several claimants who figured in the interference proceeding was the first to have the thought of this three carrier method, we could make the finding. This, however, as we view it, is not our problem, except of course the patentee must have been first. That part of the public who buy this product have possible rights which must be considered. The prior art has its possessions, of its right to which it cannot be deprived. If, for illustration, the idea of this three carrier method was one of its possessions, no one can appropriate it by patenting the idea. A patentee does not invent anything by purloining an idea from the prior art. We think this to be obvious. In the first place, he is not an inventor. In the second place, which is much the same thing, if this method was known to those skilled in the art, resort to it would not call for invention.

This opinion has already been drawn out to such length that we content ourselves with the fact finding that the three carrier method was a possession of the prior art. We are led to this conclusion in part by the fact that it was in use by the weaving art and by the knitting art in the knitting of other fabrics intended for human wear. We see no difference between a covering for the torso or something to be worn on the neck and stockings to cover the legs. The possession by the prior art of the idea of the use of the three carrier method likewise gives us an explanation of the other fact features of this case which may have significance. One is the unusually large number of claimed inventors of the idea at stake. This might support the inference that the call made was not for invention but for the application of ordinary skill. The truth is possibly closely akin to this, but it may be expressed under the figure that each of these applicants for a patent was in need of water and each went to the common well of the prior art to get it. No one of them supplied the inventive idea but each took it from the same source.

Another circumstance is that the idea of this method occurred to so many at about the same time and that they were all engaged in a race to the Patent Office. Before 1930 or 1932 no one sought to patent this idea. The explanation is that there was no such demand for ringless stockings as to make a patent worth applying for. When the trade awoke to the demand there was "a mounting in hot haste" of the applicants for a patent. The case of this patentee is typical. Just what date he fixes as his date of conception, the record does not disclose with any certainty. His disclosure to others was, however, February 25, 1932; his reduction to practice in early April and his patent application bears date May 20, 1932. Certainly no grass grew under his feet nor that of any of the others. If the idea was already known and needed only to be tested out in chiffon hosiery wear to demonstrate its practical value, this common rush to the Patent Office is explained.

We conclude this overlong discussion by repeating the finding already in effect made that this patentee was not the inventor of the three carrier method and consequently not the first inventor.

We hurriedly dispose of the additional particular contentions of the defendants, granting to the plaintiffs the full benefit of their prima facie right to a patent monopoly. The real defense is that we have attempted to outline at doubtless overdue length.

### Lack of Invention.

It is urged that there was in applying the three carrier method no call for invention but merely for the application of the skill of those skilled in the art.

The argument supporting this overlooks the fact that many in the art ridiculed the idea as futile. This negatives the thought that it was an obvious one.

We dispose of this branch of the defense by holding that if the idea upon which the patent is based was not a possession of the prior art but was first introduced by the patentee, the patent is valid.

### Incomplete Invention.

By this is meant that the patent is not for a machine but merely a method including its product. The application discloses that the method was to be employed in machinery-made stockings. Before it could be applied a machine must be invented. The claimed patent was in consequence for nothing more than an idea.

This defense overlooks the fact that the three carrier method had long been in use for the making of striped fabrics. There would be no mechanical difference between a machine for making a striped fabric and one for making of the fabric of the patent.

In compliance with Equity Rule 70½ (28 U.S.C.A. following section 723), we make the following findings of fact and state conclusions of law:

### Findings of Fact.

1. The three carrier method of making knitted stockings was known to the art before the patentee claimed to have invented it.

2. The patentee was not the first inventor of the patented method of knitting stockings.

3. The patentee did not invent the patented method of knitting stockings.

### Conclusions of Law.

1. That patent in suit is invalid for want of novelty in the method patented.

2. The patent in suit is invalid for want of novelty in the product of the patented method.

3. The bill should be dismissed for want of equity.

4. The counterclaim should be dismissed.

For appellate and other purposes no decree is now entered, but leave is given to submit one.